```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2
                         CASE NO. 19-MJ-08100-WM-1
 3
     UNITED STATES OF AMERICA,
 4                                          West Palm Beach, Florida
                   Plaintiff(s),
 5                                          April 8, 2019
              vs.
 6
     YUJING ZHANG,
 7
                   Defendant(s).      Pages 1 - 76
 8   ------------------------------------------------------------

 9                              HEARING
                 TRANSCRIBED FROM DIGITAL AUDIO RECORDING
10               BEFORE THE HONORABLE WILLIAM MATTHEWMAN
                     UNITED STATES MAGISTRATE JUDGE
11
     APPEARANCES:
12
     FOR THE PLAINTIFF(S):   ROLANDO GARCIA, ESQ.
13                           UNITED STATES ATTORNEY'S OFFICE
                             500 South Australian Avenue
14                           West Palm Beach, FL 33401
                             (561) 820-8711
15                           rolando.garcia@usdoj.gov

16   FOR THE DEFENDANT(S):   ROBERT E. ADLER, ESQ.
                             FEDERAL PUBLIC DEFENDER'S OFFICE
17                           450 Australian Avenue
                             West Palm Beach, FL 33401
18                           (561) 833-6288
                             robert_adler@fd.org
19

20   TRANSCRIBED BY:         Joanne Mancari, RPR, CRR, CSR
                             Court Reporter
21                           jemancari@gmail.com

22

23

24

25
```

<pre>
 1                      INDEX OF EXAMINATION

 2    Examination of:                        Page

 3    SAMUEL IVANOVICH

 4    Cross By Mr. Adler.  . . . . . . . . . . . . .13

 5    Redirect By Mr. Garcia . . . . . . . . . . . .60

 6                    GOVERNMENT EXHIBITS

 7    Exhibit No.                         Received

 8     1   . . . . . . . . . . . . . . . . . . . .18

 9     2, 3, 4, 5 and 7  . . . . . . . . . . . . . .72

10                    DEFENDANT EXHIBITS

11    Exhibit No.                         Received

12     6   . . . . . . . . . . . . . . . . . . . .49

13

14

15

16

17

18

19

20

21

22

23

24

25
</pre>

1    Thereupon,

2    the following proceedings were held:

3            THE DEPUTY CLERK:  Calling United States of America v.

4    Yujing Zhang, case No. 19 8100-WM.

5            THE COURT:  Let's give appearances.  Who do we have

6    here for the government?

7            MR. GARCIA:  Good afternoon, your Honor.  Rolando

8    Garcia on behalf of the United States.  With me is United

9    States Secret Service Agent Samuel Ivanovich.

10           THE COURT:  All right.  Good afternoon to both of you.

11           And who do we have here for the defense?

12           MR. ADLER:  Good afternoon, your Honor.  Robert Adler,

13   Assistant Federal Public Defender, on behalf of Ms. Zhang.

14   With me at counsel table is Assistant Federal Public Defender

15   Kristy Militello.

16           Today we have the privilege of representing Ms. Zhang,

17   who is a visitor to this country from the People's Republic of

18   China.

19           THE COURT:  All right.  Good afternoon to both of you

20   and good afternoon, Ms. Zhang.

21           If you would please stand up and be sworn.

22           THE DEPUTY CLERK:  Do you solemnly swear that the

23   testimony you are about to give will be the truth, the whole

24   truth, and nothing but the truth so help you God?

25           THE DEFENDANT:  That's correct.

```
 1            THE COURT:  And state your name, please.

 2            THE DEFENDANT:  Yujing Zhang.

 3            THE COURT:  Ma'am, you are being assisted here in

 4    court with the aid of a Mandarin interpreter.

 5            Are you understanding everything that is being said

 6    here in court with the aid of the Mandarin interpreter?

 7            THE DEFENDANT:  Yes.

 8            THE COURT:  All right.  Thank you.  You can have a

 9    seat.

10            If the Mandarin interpreter would please state her

11    name for the record, please.

12            THE INTERPRETER:  Yes, your Honor.  Ziaoling Richards.

13            THE COURT:  All right.  Thank you.

14            So we are here today for a detention hearing in this

15    case.  Are the parties ready to proceed to a detention hearing

16    today?

17            MR. GARCIA:  Yes, your Honor.

18            THE COURT:  All right.  How about the defense?

19            MR. ADLER:  Your Honor, we are ready to proceed with

20    the government's case and the defense proffer as evidence.

21            In regard to a defense proposal for bond, we are

22    asking for a one-week extension of this hearing until next

23    Monday.  We have had communications with individuals in China,

24    some of which we are hoping will be traveling here in support

25    of the defense proposal for release.  However, we have also
```

1    been informed before this hearing that Ms. Zhang's visa has

2    been revoked by the United States government and that there

3    will be an immigration detainer lodged against her.  In fact, I

4    believe one has already been lodged against her, which somewhat

5    complicates our efforts in that we will also have to arrange

6    for and attempt to, if she was released by this court, for her

7    to obtain bond in the immigration proceedings.  So for that

8    reason we would ask the court to allow us one week to support

9    those efforts.

10           THE COURT:  For the bond issue.  But we are ready for

11   the detention hearing today as far as the government's

12   position.

13           MR. GARCIA:  We are ready.

14           THE COURT:  OK.  Great.  So what I am going to do then

15   at this time is I am going to take judicial notice of the

16   criminal complaint and affidavit in case No. 19-8100-WM.  I'm

17   also going to take judicial notice first of the abbreviated

18   Pretrial Services report and then the Pretrial Services report

19   in this case.

20           The government can proceed by proffer.

21           MR. GARCIA:  Thank you, your Honor.

22           THE COURT:  Mr. Garcia.

23           MR. GARCIA:  Your Honor, we are proceeding under the

24   prong of the risk of flight.

25           THE COURT:  All right.  And if we could, just so I

1    could remind everybody, we are using the Mandarin interpreter

2    so that makes it a little bit more labored.  So counsel on all

3    sides, both sides, could just speak as slowly as possible so we

4    can make sure there is a good Mandarin translation of this.

5         So the government is moving on serious risk of flight

6    or nonappearance, arguing that if the defendant is released on

7    bond she presents a serious risk of flight and nonappearance.

8         MR. GARCIA:  That's correct, Judge.

9         THE COURT:  Is there any rebuttal presumption at play

10   in this case?

11        MR. GARCIA:  No.

12        THE COURT:  All right.  Go right ahead.

13        MR. GARCIA:  Yes, sir.  Essentially what is indicative

14   of her serious risk of flight are the fact that she lies to

15   everyone that she encounters, and I will go into that in a

16   minute.  She has really no ties to the Southern District of

17   Florida nor the United States of America for that matter.

18        As the defense has brought up, her B1 visa was revoked

19   by the Department of State and she presently has a detainer.

20   She has no legal status in the United States of America.  Even

21   if a bond were posted, she would go into Immigration custody.

22        Now, with respect to her history of lying, I will go

23   into some of the details that are reflected in the complaint

24   and some other matters.  As reflected in the complaint, she

25   tells the Secret Service agent at the primary checkpoint at

1    Mar-a-Lago that she was going to the pool.  It's pretty clear

2    that's what she said.  They even reached out to the pool

3    attendants.

4          She wasn't wearing a bathing suit.  She had no bathing

5    suit in her purse.  She was wearing a long gray dress.

6          A subsequent search of that purse didn't reveal any

7    bathing suit.  In fact, what it revealed was a total of four

8    cellular phones, one laptop computer, one external hard drive,

9    and one thumb drive.

10         After the initial checkpoint, she told the valet

11   driver on the golf cart shuttle that she did not know where she

12   wanted to go.  He asked her, Where do you want to go?  She

13   said, I don't know where I want to go.

14         She was taken to the receptionist area at Mar-a-Lago.

15   Then she changed her story.  She told them that she was there

16   for a United Nations Chinese American Association event later

17   that evening.

18         Her story then changes again.  And once they confirm

19   there is no such event, Secret Service are notified and Special

20   Agent Ivanovich interviews the defendant at the reception area.

21         She changes her story again.  She told Secret Service

22   that she was there for a United Nations Friendship event

23   between China and the United States.  There was no such event.

24         The defendant showed the agent a purported invitation

25   which was on her cell phone.  It was in Chinese.  It was the

1   Chinese language.  The agent is not fluent in Mandarin and

2   couldn't decipher what was said.

3          Her phone, along with the other devices I mentioned

4   earlier, had been seized and they are in the process of being

5   analyzed forensically.  A preliminary analysis of that phone

6   does not support her position that she was there for an event

7   at Mar-a-Lago.

8          She also claimed that she had communications with a

9   fellow named Charles who had organized the event.  A

10  preliminary analysis of the devices do not support her position

11  that she had any -- that she had communication with Charles.

12         The organization that was supposedly sponsoring the

13  event at Mar-a-Lago, which the defendant claims she was there

14  to attend, had been canceled on March 22, 2019.  That

15  organization had not promoted the event as a United Nations

16  Chinese American Association event or a United Nations

17  Friendship event.  In fact, that organization had taken down

18  their website weeks before.

19         She subsequently told Secret Service that she had all

20  those electronic devices because she didn't want to leave them

21  in her hotel room because she was afraid that they would be

22  stolen.  That was another lie.

23         Secret Service subsequently obtained the property in

24  her hotel room at the Colony Hotel in Palm Beach.  There were

25  numerous electronics and U.S. currency, Chinese currency.  The

1    United States currency totaled $7,620.11.

2              THE COURT:  That was in her hotel room at the Colony?

3              MR. GARCIA:  Yes, sir.

4              THE COURT:  OK.

5              MR. GARCIA:  7500 of that was in 100 dollar bills.

6    There was also Chinese currency with the equivalent of about

7    $663.  In fact, I would point out, your Honor, that she was not

8    candid with you last Monday at her initial hearing.  When asked

9    about money in the United States, she led you to believe that

10   she had around $5,000 in a Wells Fargo bank account.  She had

11   over $8,000 at her hotel room.

12             Among the property found in her hotel was one cell

13   phone, one signal detector -- basically it's a radio frequency

14   device that can detect hidden cameras -- several credit cards

15   and debit cards, nine USB drives, and five SIM cards.

16             THE COURT:  You said there were several credit cards?

17             MR. GARCIA:  Yes, sir.

18             THE COURT:  And were they in her name?

19             MR. GARCIA:  Yes, sir.

20             THE COURT:  And what else did you indicate was there?

21             MR. GARCIA:  Nine USB drives and five SIM cards.

22             THE COURT:  All right.  Go ahead.

23             MR. GARCIA:  Again, as someone who is afraid of her

24   property being stolen at the hotel does not leave so much cash

25   and credit cards in the hotel room.

```
1              With respect to her travel to the United States, she

2     arrived in Newark, New Jersey, on board a flight that

3     originated from Shanghai, China, on March 28, 2019.

4              THE COURT:  And then arrived where?

5              MR. GARCIA:  Newark.

6              She was allowed entry based on a B1 tourist visa.

7     That visa was revoked by the Department of State the latter

8     part of last week.  She therefore has no status in the United

9     States.  A detainer has been placed.

10             With respect to the information that's in the Pretrial

11    Services report, the information she provided to the Pretrial

12    Services officer is totally unverifiable, as indicated in the

13    report.  So defendant lacks familial ties, she lacks

14    residential ties, she lacks community ties, she lacks

15    employment ties, she lacks property ties and financial ties to

16    this district and the United States of America.  Her ties are

17    all in China, not here.

18             To say that there is incomplete information of her

19    financial assets is an understatement.

20             Therefore, based on all the lies she has told to the

21    folks she encounters in relation to her visit her in connection

22    with this case, the fact that she has absolutely zero ties to

23    the United States of America and the fact that she has no legal

24    status to be in the United States of America, the United States

25    respectfully urges this court to detain the defendant based on
```

 1   serious risk of flight.

 2           THE COURT:  All right.  So the only question is should

 3   she be held with no bond on pretrial detention.

 4           MR. GARCIA:  That's correct, Judge.

 5           THE COURT:  Now, let me just ask you and clarify that

 6   she is currently charged by way of a criminal complaint and

 7   affidavit; an indictment has not yet been returned, correct?

 8           MR. GARCIA:  Correct.

 9           THE COURT:  Now on the first charge that she's charged

10   with, the false statements to a federal officer under Title 18,

11   United States Code, Section 1001, my understanding is if

12   convicted there is a five-year maximum prison term, three years

13   of supervised release, up to a $250,000 fine, and a $100

14   special assessment.  Is that correct?

15           MR. GARCIA:  That's correct, Judge.

16           THE COURT:  The second count she's charged with is

17   entering and remaining in a restricted building or grounds, in

18   violation of Title 18, United States Code, Section 1752(a)(1).

19           Now, my understanding is that is a federal misdemeanor

20   punishable if convicted by up to one year in prison, up to a

21   thousand dollar fine, up to one year of supervised release, and

22   a $25 mandatory special assessment.

23           Is that accurate?

24           MR. GARCIA:  That's accurate, Judge.

25           THE COURT:  And then if she's convicted, she faces

1    deportation or removal from the United States.

2              MR. GARCIA:  That is correct.

3              THE COURT:  Do you anticipate when an indictment may

4    be returned?

5              MR. GARCIA:  As early as this week.

6              THE COURT:  As early as this week?

7              MR. GARCIA:  Yes, sir.

8              THE COURT:  Do you anticipate it would be the same

9    charges, additional charges?  Are you able to say at this time,

10   or are you not?

11             MR. GARCIA:  I'm unable to say at this time, Judge.

12             THE COURT:  OK.  Anything else from you on behalf of

13   your proffer at this time?

14             MR. GARCIA:  No, sir.

15             THE COURT:  Thank you.

16             All right.  Mr. Adler, Ms. Militello, how do you wish

17   to proceed?

18             MR. ADLER:  Your Honor, we would ask that the agent be

19   made available for cross-examination.

20             THE COURT:  All right.  I believe that you had

21   indicated that Agent Samuel Ibanovich, special agent with the

22   U.S. Secret Service, is here.

23             MR. GARCIA:  That's correct, Judge.

24             THE COURT:  All right.

25             Could you please come up, agent, and take the stand.

1    SAMUEL IVANOVICH,

2          called as a witness by the Government,

3          having been duly sworn, testified as follows:

4                THE COURT:  All right.  You are an agent, special

5    agent, with the U.S. Secret Service?

6                THE WITNESS:  Yes, Judge.

7                THE COURT:  All right.  Thank you.

8                Counsel, you may proceed.

9                MR. ADLER:  Your Honor, before I proceed, I did make a

10   request for Jencks material from the government.  I was

11   informed that other than the criminal complaint there are no

12   Jencks materials.

13               THE COURT:  All right.  Mr. Garcia, is there any other

14   Jencks that the government has as to this witness other than

15   the criminal complaint and affidavit?

16               MR. GARCIA:  Nothing that has been formally submitted

17   and approved yet.

18               THE COURT:  All right.  Mr. Adler, you can proceed.

19   CROSS-EXAMINATION

20   Q.  Good afternoon, agent.

21   A.  Good afternoon.

22   Q.  Agent, I would like to go over with you the criminal

23   complaint that I believe you drafted and signed.

24   A.  Yes, sir.

25   Q.  I would like to start off by focusing on the initial

1    interaction that Ms. Zhang had with security at Mar-a-Lago on

2    March, the 30th, at approximately 12:15 p.m.

3           Perhaps you can help with some general context about

4    the Mar-a-Lago property.  That is a private club.  One side of

5    the facility is for private affairs, parties, and that type of

6    thing, correct?

7    A.  Yes, it is.

8    Q.  And the Secret Service works in conjunction with the staff

9    at Mar-a-Lago to provide security?

10   A.  Yes, we do.

11   Q.  And you work in conjunction with staff at Mar-a-Lago to

12   screen individuals to see if they are authorized to enter the

13   Mar-a-Lago property --

14   A.  Yes.

15   Q.  -- is that correct?  OK.

16          Now, Ms. Zhang, she approached the designated primary

17   checkpoint for the Mar-a-Lago property on March, the 30th,

18   correct?

19   A.  Yes, she did.

20   Q.  So she went where she was supposed to go, right?

21   A.  Yes.  She was dropped off via a taxi at our main vehicle

22   checkpoint.

23   Q.  OK.  So at this point she is doing everything that she's

24   supposed to do for someone trying to lawfully gain access to

25   Mar-a-Lago?

1    A.   Yes, she is.

2    Q.   There she has an interaction, is it first with staff of

3    Mar-a-Lago, their own security, or is it with a Secret Service

4    representative?

5    A.   No.  When she walks up to the pedestrian walkup at our main

6    vehicle checkpoint she is first initiating contact with a

7    special agent in a uniform police-marking attire for the day,

8    and that is how she is greeted when she first gets there.

9    Q.   A special agent with what entity?

10   A.   With the United States Secret Service.

11   Q.   All right.  OK.  So the first interaction is with a

12   representative of the United States Secret Service, is that

13   correct?

14   A.   Yes.

15   Q.   Now, is this interaction in this designated area at

16   Mar-a-Lago recorded in any way?  Are there any video cameras,

17   any audio facilities for recording the interaction or any type

18   of body camera or recording device that the agents have to

19   record their interaction with people at this checkpoint?

20   A.   No.  We do not set up any audio or video recording at the

21   main checkpoint.  However, we're still looking into whether

22   Ms. Zhang had been recorded during that interaction at the

23   time.

24   Q.   I'm sorry.  Can you go over that again?  You're still

25   looking into what?

1  A.  We're still doing forensic analysis on the electronics, as

2  Mr. Garcia stated, and we are still seeing if Ms. Zhang was

3  recorded during her interaction at that main checkpoint.

4  Q.  OK.  But you don't have proof at this point that she was

5  actually recorded on the interaction?

6  A.  Not at this time.

7  Q.  And in terms of supplying evidence to the court that would

8  demonstrate the actual words used by Ms. Zhang or the nature of

9  the understanding of the English language at that juncture, the

10  government has nothing to offer in terms of any type of video

11  or audio recordings of that interaction, is that correct?

12  A.  No, we do not.

13  Q.  Now, is there a reason why Mar-a-Lago does not have any

14  type of recording devices at this key checkpoint where we know,

15  for example, that you go to 7-Eleven, you're going to have

16  cameras everywhere recording what you are doing?

17          MR. GARCIA:  Objection.  Relevance.

18          THE COURT:  What is the objection, Mr. Garcia?

19          MR. GARCIA:  Relevance.

20          THE COURT:  If you know, Agent.  Do you know why or

21  why not Mar-a-Lago themselves put up or don't put up video

22  cameras?

23          THE WITNESS:  Initially our main vehicle checkpoint is

24  actually not even on Mar-a-Lago property.  It is on the club

25  next door's property.

```
 1              THE COURT:  OK.  Go ahead.
 2   BY MR. ADLER:
 3   Q.  Did the Secret Service ever make any attempt to provide
 4   camera coverage or audio coverage of that key checkpoint so
 5   there would be some type of evidence, if needed, to bring to
 6   court if there was a claim that someone was attempting to enter
 7   illegally?
 8   A.  We have license plate readers that are set up at the
 9   checkpoint.  That is only our -- whether video, audio or
10   photographic images at the checkpoint.
11   Q.  OK.  I'm not sure I understood your answer.
12              Has the Secret Service made an attempt?
13   A.  No.
14   Q.  OK.  So basically the Secret Service has made a decision
15   that the only evidence of any interaction with individuals at
16   this designated checkpoint would be the testimony of the
17   government agent --
18              MR. GARCIA:  Objection.
19   Q.  -- is that right?
20              MR. GARCIA:  Relevance.
21              THE COURT:  Sustained.
22   BY MR. ADLER:
23   Q.  Agent, when Ms. Zhang approached the agent, she did provide
24   two passports, correct?
25   A.  Yes, she did.
```

1   Q.  Let me hand you what's been marked as Defense Exhibit 1 for

2   identification purposes.  I can tell you for your information

3   that it was a copy that was provided to me by the government

4   yesterday evening.

5          Does that represent the passports that were presented

6   by Ms. Zhang at the checkpoint at that time?

7   A.  Yes, it does.

8   Q.  Well, let's take a look at the passports.

9          THE COURT:  Do you want to seek to introduce Exhibit

10  1?

11         MR. ADLER:  Judge, I do at this time.

12         THE COURT:  All right.

13         Mr. Garcia, any objection from the government for

14  purposes of this hearing as to Defendant's Exhibit 1 being

15  admitted?

16         MR. GARCIA:  No, your Honor.

17         THE COURT:  All right.  Defendant's Exhibit 1 will be

18  admitted without objection.

19         Go ahead.

20         (Government's Exhibit 1 received in evidence)

21  BY MR. ADLER:

22  Q.  Now, if you turn the page to the passport that was issued

23  July 20, 2007.  I believe that's the fourth page of the

24  exhibit.

25         Do you see that?

1    A.  Yes, I do.

2    Q.  That is one of the passports that Ms. Zhang presented at

3    the checkpoint --

4    A.  Yes, she did.

5    Q.  -- correct?

6            OK.  And that passport indicates that it was issued in

7    July of 2007, correct?

8    A.  Yes.

9    Q.  And it expired July 19, 2017, correct?

10   A.  Yes, it does.

11   Q.  Now if you look at the following page, adhered to the

12   passport there is a visa, correct?

13   A.  Yes.

14   Q.  And that visa was issued to Ms. Zhang in May of 2016,

15   correct?

16   A.  Yes, it was.

17   Q.  And the visa has an expiration date of May 18, 2026,

18   correct?

19   A.  Yes, it does.

20   Q.  Now, the type of visa is actually a B1-B2 visa, is that

21   correct?

22   A.  Yes, I believe so.

23   Q.  Well, are you aware that in order to obtain such a visa

24   Ms. Zhang would have been required to appear at an office of

25   the United States to submit to an interview and would be

1    submitted to a background check by the United States

2    government?

3    A.  Mr. Adler, I'm not --

4    Q.  You're not familiar with that?

5    A.  -- not familiar with immigration laws as well on --

6    Q.  OK.

7    A.  That is not in my background.

8    Q.  So you can't comment on the nature of the visa?

9    A.  I cannot comment on the nature of the visas or what process

10   they go through to obtain each visa.

11   Q.  OK.  I think you can agree that this appears to be a valid

12   visa for the date that Ms. Zhang was here in the United States,

13   is that correct?

14   A.  Yes, that is -- appears so.

15   Q.  And that this visa was adhered to a passport that had

16   expired, correct?

17   A.  Yes, it was, via rubber band.

18   Q.  OK.  Now, Ms. Zhang did have, in conjunction with the visa,

19   she had a passport that was in good standing, correct?

20   A.  Yes, she did.

21   Q.  And that is evidenced by this exhibit and it shows that she

22   obtained a passport in February of 2017, correct?

23   A.  Yes.

24   Q.  And that passport expired in 2027?

25   A.  Yes.

```
1    Q.   Now when you look at the passports, it shows that she

2    traveled to the United States in July of 2016 -- you will have

3    to go to the last page to start looking at this -- in January

4    of 2017, then if you go to her new passports, in December of

5    2017, then September of 2018, and that she entered this country

6    on March 28, 2019.  Would you agree?

7    A.   Yes, I would.

8    Q.   Now in looking at the passport, you can't tell the duration

9    of her travel in the United States, correct?

10   A.   No.

11   Q.   Does the Secret Service have any information that Ms. Zhang

12   ever studied in the United States?

13   A.   No, we do not.

14   Q.   Do you have any information that she was ever employed in

15   the United States?

16   A.   No, we do not.

17   Q.   Do you have any information that she has ever had any

18   extensive education or training in English either in the United

19   States, in China, or anywhere in the world?

20   A.   I do not.

21   Q.   So let's go back --

22            THE COURT:  Mr. Adler, if I'm clear then, there's one

23   passport that's expired, one passport that's current --

24            MR. ADLER:  Correct.

25            THE COURT:  -- as part of Defendant's Exhibit 1, and
```

1  then a copy of the visa, is that right?

2          MR. ADLER:  That's correct, Judge.

3          THE COURT:  All right.

4  BY MR. ADLER:

5  Q.  Let's turn back to that designated entry there.  Ms. Zhang

6  presented her passport, which we now know shows that she was

7  lawfully in the United States, to the Secret Service agent,

8  correct?

9  A.  Yes.

10  Q.  You weren't there at that time, right?

11  A.  No, I was not.

12  Q.  At that time, according to your complaint, Ms. Zhang said

13  that she was going to the pool?

14  A.  Yes.

15  Q.  But this wasn't recorded in any way, as you've already

16  noted, correct?

17  A.  No, it was not.

18  Q.  The security apparently, according to your complaint, then

19  called the manager of the beach club to attempt to identify

20  Ms. Zhang as potentially being a member of the club, is that

21  correct?

22  A.  Yes, he did.

23  Q.  And in the interaction with Ms. Zhang, according to your

24  complaint, based upon information that an individual who was a

25  member had her last name, Ms. Zhang, in response to some type

1   of inquiry, did not give a definitive answer to whether or not

2   this individual was her father, is that correct?

3   A.  No, she did not.

4   Q.  So Ms. Zhang did not say that she was actually the daughter

5   of that individual, correct?

6   A.  No.

7   Q.  Ms. Zhang at no time said that she was actually a member of

8   the beach club at Mar-a-Lago, correct?

9   A.  No.

10  Q.  In fact, when she was asked about why she was there,

11  according to your complaint, she did not give a definitive

12  answer when asked if she was there to meet with anyone,

13  correct?

14  A.  No, she did not.

15  Q.  So we know that she didn't say that she was a member of the

16  club, correct?  Right?

17  A.  No, she did not.

18  Q.  So we know that she didn't say that she was a member of the

19  club, correct?

20  A.  No, she did not say she was a member.

21  Q.  She didn't say she was related to a member, correct?

22  A.  No, she did not give an answer.

23  Q.  She didn't say that she was there to meet anyone

24  specifically, correct?

25  A.  No, she did not.

```
1    Q.  So at this point the only thing that Mar-a-Lago security
2    and the Secret Service knew about Ms. Zhang is that she had the
3    last name of Zhang, which was the same last name as a member of
4    Mar-a-Lago, that she was lawfully in the United States, and
5    that she was not claiming membership or relation to that
6    individual as an attempt to gain access, is that correct?
7    A.  That is true.
8    Q.  Now, are you familiar either through your Secret Service
9    training or with any type of searches that were done or could
10   have been done at the time that the name Zhang is one of three
11   names in China for which over 275 million Chinese have one of
12   those three names?
13          Was there any type of research or inquiry made at the
14   Mar-a-Lago designated area to determine, for example, how
15   common is this name Zhang?  Does it really mean anything that
16   she has the same last name as this member?  Was that done in
17   any way?
18   A.  No, that was not.  Our policies, according to individuals
19   entering a host site that we are at, we verify that they
20   present us a government-issued ID that is valid and it is upon
21   the host committee to inform us whether that guest is allowed
22   access into a site or not.  Our status there for security
23   protocol is to make sure everybody is identified with a
24   valid-issued ID.
25   Q.  OK.  So I understand what your protocol was, but regardless
```

1    of the protocol, the only information that the government had,

2    the Secret Service had at the time Ms. Zhang attempted to gain

3    access to the Mar-a-Lago property was the information we just

4    discussed or lack thereof, correct?

5    A.  Yes.

6    Q.  In fact, your complaint recognizes that there was a

7    potential language barrier in regards communications with

8    Ms. Zhang, correct?

9    A.  Yes.

10   Q.  And the Secret Service agent was present at the time that

11   this interaction was occurring, correct?

12   A.  Yes.

13   Q.  And even though the Secret Service agent was there who

14   could have said, for example, there is no language barrier,

15   your complaint indicates that the impression at that time was

16   that there was a language barrier, correct?

17   A.  Yes.

18   Q.  So in essence, Ms. Zhang went through this designated area

19   and it is as if in the United States there are only three last

20   names of Jones, Smith and Zhang and she said I want to go to

21   the pool, my name is Zhang, which is one of the three names in

22   this country, and the Mar-a-Lago staff, when she doesn't answer

23   some questions about any relationships, they basically just

24   wave her in.  In essence, that's what happened, correct?

25              MR. GARCIA:  Objection, your Honor.  Compound

```
 1    question.
 2               THE COURT:  Sustained.
 3    BY MR. ADLER:
 4    Q.  Now, at this point it was indicated by someone at
 5    Mar-a-Lago that due to a potential language barrier, a decision
 6    was made to give her entry to the Mar-a-Lago property, correct?
 7    A.  Yes, it was.
 8    Q.  And at that point how long was it before Ms. Zhang
 9    interacted with the shuttle driver to take her somewhere on the
10    property?
11    A.  That specific time frame I am not aware of, but in working
12    at Mar-a-Lago multiple times, the wait time for her at the main
13    checkpoint prior to the shuttle driver would be approximately
14    no less than two minutes.
15    Q.  OK.  So she's there about two minutes.  I guess is that
16    standard procedure that someone going through that checkpoint
17    can't simply walk where they're going, they have to be taken
18    there by this shuttle cart?
19    A.  Yes.
20    Q.  OK.  So Ms. Zhang then has an interaction with the shuttle
21    cart driver which you describe in your complaint, correct?
22    A.  Yes, she does.
23    Q.  And is this interaction based upon conversations that the
24    Secret Service had with the shuttle cart driver?
25    A.  Yes, myself and other agents from the United States Secret
```

1    Service.

2    Q.   And was that interaction with the shuttle cart driver, was

3    that recorded in any way?

4    A.   No, it was not.

5    Q.   According to the information in your complaint, which we

6    now know came from direct interaction with the shuttle cart

7    driver, the shuttle cart driver was already the driver and

8    asked Ms. Zhang, and I assume that was in English --

9    A.   It was in English.

10   Q.   -- where she intended to go in the Mar-a-Lago property,

11   correct?

12   A.   Yes.

13   Q.   And at that point Ms. Zhang simply responded that she

14   didn't know where to go, right?

15   A.   Yes, she did.

16   Q.   Now, would you agree that perhaps someone who, for example,

17   wanted to tour the property and go to the pool might not know

18   where that was and might make that response?

19        MR. GARCIA:   Objection.   He's asking the witness to

20   speculate.

21        THE COURT:   All right.

22        That is sustained.

23        MR. ADLER:   I'm sorry?

24        THE COURT:   That's sustained as to speculation.

25        MR. ADLER:   All right, your Honor.

1   BY MR. ADLER:

2   Q.  In any event, it was the decision of the shuttle cart

3   driver to take Ms. Zhang to the main reception area, correct?

4   A.  Yes.

5   Q.  So at this point we know that Ms. Zhang gained entrance in

6   the manner that we went over, went to the area where she was

7   supposed to go to, and is now in compliance with all the

8   security at Mar-a-Lago, was now being accompanied somewhere by

9   this cart driver?

10  A.  Yes.

11  Q.  OK.  It was the cart driver's decision to drive her to the

12  main reception area, is that also correct?

13  A.  Yes, it is.

14  Q.  It's not as if she -- you have no evidence that she said I

15  want to go to this location or that location or another

16  location, correct?

17  A.  The only information I had was when myself and other agents

18  from the Secret Service interviewed him, he asked her where she

19  specifically wanted to go and she stated back to him she did

20  not know.

21  Q.  OK.  So at that point he takes her where?

22  A.  To the main magnetometer checkpoint just outside the

23  reception area at Mar-a-Lago.

24  Q.  So at this point Ms. Zhang is now again being directed to a

25  place in Mar-a-Lago.  She is not herself walking there on her

1   own or going there on her own.  She's following directions.  Is

2   that correct?

3   A.  When she is dropped off by the valet driver, she is dropped

4   off into the main magnetometer checkpoint.  She would then have

5   to proceed through that security screening, and after that she

6   is a normal pedestrian or member or guest inside of Mar-a-Lago

7   that can walk around the club freely.

8   Q.  All right.

9   A.  They are not escorted.

10  Q.  OK.  Thank you.

11          So at this point the next step for her was to go

12  through the magnetometer to go to the main reception, is that

13  correct?

14  A.  Yes.  She actually stopped in front of one of our security

15  restricted access signage, stood in front of there for

16  approximately 20 seconds and then followed the security

17  protocol we have at the main magnetometer checkpoint.

18  Q.  All right.  So then she is not only following directions,

19  but she is trying to make some determination of what she should

20  be doing and the proper procedures, correct?

21  A.  That is my understanding.

22  Q.  She then goes through the clearance procedures before she

23  can gain access to other parts of the property, correct?

24  A.  Yes.  Everybody has to go through that checkpoint prior to

25  proceeding any further.

1    Q.   And that is a metal detector?

2    A.   Yes, it is.

3    Q.   And are your belongings searched by the Secret Service at

4    that point?

5    A.   Yes, they are searched by our United States Secret Service

6    uniformed division.

7    Q.   And as part of that search, whoever was there on behalf of

8    the Secret Service, would have seen that she had four cell

9    phones, correct?

10   A.   Yes, they would have.

11   Q.   And they would have seen that she had a laptop with her,

12   correct?

13   A.   Yes, they would have.

14   Q.   They would have seen that she had an external hard drive

15   with her, is that also correct?

16   A.   Yes, they would have.

17   Q.   And they would have seen that she had a thumb drive with

18   her, correct?

19   A.   Yes, they would have.

20   Q.   So she didn't try to hide any of those devices from Secret

21   Service scrutiny, correct?

22   A.   No, their protocol there is not to determine what people

23   bring in.

24   Q.   That wasn't my question.

25             My question was, did she attempt to hide any of those

 1   devices from the Secret Service personnel?

 2           MR. GARCIA:  Your Honor, he's asking the witness to

 3   speculate on what her intentions were.

 4           MR. ADLER:  I can rephrase it, Judge.

 5           THE COURT:  Why don't you rephrase it.  I know he was

 6   getting ready to answer it in a different way, but why don't

 7   you rephrase the question.  I don't want him to speculate on --

 8   BY MR. ADLER:

 9   Q.  Is there any evidence that you uncovered that Ms. Zhang

10   attempted to hide any of those devices from Secret Service

11   scrutiny at that time?

12   A.  No, there was not.

13   Q.  So is there any evidence that anyone on behalf of the

14   Secret Service at that time said something like, hey, why do

15   you have four cell phones?

16   A.  No.  At that checkpoint the protocol is not to question the

17   quantity unless it is something that is in violation of our

18   security protocols there.

19   Q.  So the fact that she had four cell phones was in compliance

20   with your security protocols and that in and of itself doesn't

21   raise any kind of alarm on the part of the Secret Service,

22   correct?

23   A.  In terms of security protocols, if someone has a certain

24   number of cell phones on them, we don't deny someone for having

25   so many cell phones.  That's not a direct violation of our

```
 1   restricted access.

 2   Q.  So the answer to my question is that none of the cell

 3   phones that she had or the quantity, nothing about them was in

 4   any way not in compliance with the screening procedures to gain

 5   entry into the Mar-a-Lago property, is that correct?

 6   A.  For compliance purposes, no, that is not a violation.

 7   Q.  And the same is true with the laptop.  She wasn't ask why

 8   do you have the laptop because she could have a laptop at that

 9   point in time, correct?

10   A.  Yes, she can have a laptop.

11   Q.  Same thing goes for the external hard drive?

12   A.  Yes.

13   Q.  Same thing goes for the thumb drive, right?

14   A.  Yes.

15   Q.  So, for example, if a Secret Service agent is going through

16   someone's property at that checkpoint and let's just say they

17   think something is unusual or cause for alarm, they have the

18   right to inquire further of that individual and to conduct a

19   further inspection of whatever it is that the person is

20   bringing in at that point, correct?

21   A.  Our checkpoints are for items that are restricted from our

22   secured sites, such as weapons, explosive biological hazards,

23   not, you know, whether somebody brings in a certain amount of

24   cell phones or laptops or hard drives.  We're looking more for

25   security violations.
```

1   Q.  Well, in that vein, when Ms. Zhang went to that security

2   checkpoint, she didn't have with her things like any kind of

3   lock-picking devices, correct?

4   A.  Not that I'm aware of, no.

5   Q.  She didn't have any special types of electronic devices

6   that could be planted on the grounds and might facilitate some

7   type of espionage activity, right?

8          MR. GARCIA:  Objection.  Relevance.

9          MR. ADLER:  Your Honor, may I be heard?

10          THE COURT:  Yes.  What is the relevance of that

11   question?

12          MR. ADLER:  The relevance is that the inference is

13   raised in the criminal complaint that somehow Ms. Zhang was

14   involved in espionage activities on behalf of the People's

15   Republic of China.  It is our position that, and this is in

16   line with my questioning, that she did not have any type of

17   device that might have been associated with any kind of

18   espionage activities, which I think goes to the issues relating

19   to whether she should be detained or not.

20          THE COURT:  Government.

21          MR. GARCIA:  Your Honor, she is charged by complaint

22   for lying to Secret Service and unlawfully being on protected

23   property.  There is no allegation that she is involved in any

24   espionage.  There is no other allegation with respect to that.

25   So all this is irrelevant.

1      MR. ADLER:  Well, thank you for that disclosure.  We
2   appreciate that.
3      THE COURT:  All right.  So based on that I'll sustain
4   the objection.
5      MR. ADLER:  OK.
6   BY MR. ADLER:
7   Q.  So in terms of illegal activity per se, I mean, there
8   weren't any things like lock-picking devices that she was
9   trying to gain entry to somewhere by picking locks, correct?
10  A.  No, I did not find any lock-picking devices.
11  Q.  Are you familiar with devices that can defeat crash bars in
12  doors to gain access to places you're not supposed to have
13  access to?
14  A.  Yes, I am.
15  Q.  Did she have any devices like that?
16  A.  No, I did not find any.
17  Q.  Are you familiar with things that are referred to as
18  pineapple devices that can be utilized and planted to steal
19  passwords to computers?
20      MR. GARCIA:  Objection.  Relevance, Judge.
21      MR. ADLER:  Judge, I just want to say she is out there
22  for any kind of, other type of fraudulent activity.
23      THE COURT:  I think he's testified that none of those
24  devices were in her possession.
25      MR. ADLER:  OK.

1    BY MR. ADLER:

2    Q.  So at this point we are at the point where Ms. Zhang has

3    gone through the metal detector, submitted to the Secret

4    Service scrutiny, and then she goes apparently to the

5    receptionist, is that correct?

6    A.  She goes to the main lobby where the receptionist sits.

7    Q.  OK.  And this would be a natural point for someone to go

8    who is looking for whatever it is they are supposed to be at or

9    where they want to go in Mar-a-Lago?

10   A.  That is the only way that they can enter after going

11   through the main magnetometer checkpoint.

12   Q.  So at this point, again, Ms. Zhang is simply following

13   normal procedures and obeying apparently whatever is expected

14   of visitors to Mar-a-Lago, correct?

15   A.  Yes, she is.

16   Q.  Now when she gets to the receptionist, according to your

17   complaint, she responded that she was there for a United

18   Nations Chinese American Association event later that evening,

19   is that correct?

20   A.  Yes.

21   Q.  So according to the receptionist she was candid that she

22   had come to Mar-a-Lago well before the event which she said is

23   to occur that evening, correct?

24          MR. GARCIA:  I object to the term "candid."  He's

25   asking the witness to speculate as to what another witness

1 | would speculate to.

2 |        THE COURT:  I'll sustain that.

3 |        Why don't you rephrase the question.

4 |        MR. ADLER:  I will, Judge.

5 | BY MR. ADLER:

6 | Q.  She told the receptionist that she was not there for the

7 | event at that particular time, but that she was there for an

8 | event that was to occur in the evening, correct?

9 | A.  In the interview of the receptionist, she stated that she

10 | asked Ms. Zhang multiple times why she was at Mar-a-Lago.  It

11 | wasn't until after being asked several times that Ms. Zhang

12 | finally stated what her purpose at Mar-a-Lago was for.

13 | Q.  Now, the receptionist does not speak Mandarin, does she?

14 | A.  No, she does not.

15 | Q.  You've already noted in your complaint that at the original

16 | entry point there was a reference to a potential language

17 | barrier, correct?

18 | A.  Yes.

19 | Q.  You have already admitted that the Secret Service has no

20 | knowledge of Ms. Zhang's training or education in English or

21 | having studied English either here or elsewhere, correct?

22 | A.  The only English I know of with Ms. Zhang is through my

23 | extensive time with her, interviewing her, and multiple

24 | incidences where I've spoke to her and had her read things in

25 | English to me.

1    Q.  OK.  We will get to that in a minute.

2            But the receptionist, as you said, did not speak

3    Mandarin, correct?

4    A.  No, she does not.

5    Q.  So her interaction with Ms. Zhang was in English?

6    A.  Yes, it was.

7    Q.  And according to the receptionist, at least at some point,

8    Ms. Zhang referenced that she was there for a United Nations

9    Chinese American Association event that evening, correct?

10   A.  Yes, that's what she told her.

11   Q.  Now, has the Secret Service done any investigation to show

12   that an individual by the name of Charles Lee was a founder and

13   promoter of events at Mar-a-Lago under the auspices of an

14   organization titled United Nations Chinese Friendship

15   Association?

16   A.  I'm aware of the event or the business; however, I

17   conducted several interviews with Mar-a-Lago.  There was no

18   such event that was either planned, set to be planned, planned

19   and canceled, in the name or being promoted as a United Nations

20   China and America event or a United Nations Friendship event.

21   Q.  You understand you are here as a witness, correct?

22   A.  Yes, I understand.

23   Q.  You are not here as an advocate, right?

24   A.  I understand.

25   Q.  And your training is simply to get the evidence to present

1    it to a court, correct?

2    A.  Yes, I understand.

3    Q.  And your job is to get the best evidence, right?

4    A.  Yes, I am.

5    Q.  Not to get up there and make arguments but to answer the

6    questions as best you can, correct?

7              MR. GARCIA:  Your Honor, he is being argumentative

8    with the witness.

9              THE COURT:  Sustained.

10             Let's go to the next question.

11   BY MR. ADLER:

12   Q.  Please answer my questions, Agent.  OK.

13             So your investigation did reveal that Charles Lee was

14   associated with an organization with a name that I already gave

15   to you, correct?

16   A.  I'm aware only through news articles that the media has

17   pushed out.

18   Q.  OK.  So Ms. Zhang, after giving this name to the

19   receptionist, the receptionist looked on whatever list she had

20   and that organization did not have an event there that evening,

21   correct?

22   A.  She looked on multiple lists.  First for the event and

23   found there was no such event and then she looked on a general

24   access list to make sure that Ms. Zhang was just not allowed

25   access to the property, which she did not find her there.

1   Q.   Now, did your investigation indicate that there had been an

2   event scheduled that evening by a promoter by the name of Cindy

3   Yang who had scheduled this event for this very day that

4   Ms. Zhang came to Mar-a-Lago?

5   A.   In my interviews with Mar-a-Lago staff, the only event I'm

6   aware of is a Young Adventurers event that they stated had no

7   association with Ms. Yang or any relation with China, America

8   associated to what Ms. Zhang has told us.

9   Q.   OK.   Did you conduct any investigation to determine whether

10  Mr. Lee had promoted in China that event under a different

11  name?

12  A.   No, I did not.

13  Q.   Now, after the receptionist indicated that Ms. Zhang did

14  not have an event that evening to attend, you didn't make

15  contact with Ms. Zhang, is that correct?

16  A.   Yes, I did.

17  Q.   And your contact with her was at Mar-a-Lago that time,

18  right?

19  A.   Yes, it was.

20  Q.   Now, was that in the general area of the receptionist or

21  did you take her to some room for an interview of some kind?

22  A.   It initiated in the lobby where the receptionist sits.

23  Then we voluntarily asked Ms. Zhang to move to an adjacent

24  property.   And ultimately we got Ms. Zhang to voluntarily come

25  back to the United States Secret Service West Palm Beach

1    resident office.

2    Q.  While you were at Mar-a-Lago, did she make any attempt to

3    see if anyone on the Mar-a-Lago property would be of assistance

4    in interpreting with your interaction with Ms. Zhang?

5    A.  The -- not Mar-a-Lago employees.  We had a Secret Service

6    agent from our Los Angeles field office who is fluent in

7    Mandarin and he responded to the West Palm Beach resident

8    office to assist.

9    Q.  OK.  You didn't ask him to respond to Mar-a-Lago when you

10   had this interaction at Mar-a-Lago with Ms. Zhang?

11   A.  Not the initial interaction with Ms. Zhang.

12   Q.  Now, at Mar-a-Lago -- I'm not sure this is at Mar-a-Lago.

13   Ms. Zhang told you that she was there for a United Nations

14   Friendship event, is that correct?

15   A.  Yes, she did.

16   Q.  That was at Mar-a-Lago?

17   A.  Yes.

18   Q.  And this interaction was between you in English, correct?

19   A.  Yes, it was.

20   Q.  And at that time she said that she was there early for the

21   event to familiarize herself with the property and to take

22   pictures?

23   A.  Yes, she did.

24   Q.  And she said that in English to you?

25   A.  Yes, she did.

1    Q.   Now, did you ask her if she had any kind of documentation

2    for the event that she said she was there for that evening?

3    A.   I did ask her for this invitation that she received.

4    Q.   And your complaint says that she had some documentation

5    relating to the event, is that correct?

6    A.   She stated to me that she had an invitation to this event;

7    however, it was on her cell phone that we found on her person.

8    When she showed me the invitation, it was completely in

9    Chinese/Mandarin writing.  She briefly flashed it to me for

10   approximately two seconds.  I even stated to her that I was

11   unable to read it because I am not fluent in that language, in

12   which she turned the invitation away from me.

13   Q.   Now, at that point did you determine how she accessed that,

14   whatever it was she was showing you, or is that from some

15   document she had stored on her phone or did she have to access

16   some account in order to pull up that document?

17   A.   She was looking into her phone.  I was unable to see the

18   screen while she was pulling it up.  I only saw the screen when

19   she flashed the supposed invitation.

20   Q.   OK.  So you didn't know how she accessed that document at

21   that point, correct?

22   A.   No.  She was turning the screen away from me as she was

23   doing that.

24   Q.   OK.  Now, when she turned the screen away from you, did you

25   ask her if you could see the screen again to photograph it or

1   to take a screenshot of it, to send to someone such as your

2   field agent to aid you in interpreting what it said on this

3   document?

4   A.  No, I did not.

5   Q.  Did you ask her simply to read to you what the document

6   said?

7   A.  I asked her what it was and that's when she then reiterated

8   again that it was the invitation for the United Nations

9   Friendship event.

10  Q.  OK.  And did you then say would you please read that

11  document to me so that I can present and have a better

12  appreciation of why you think you should be here?

13  A.  No --

14  Q.  Did you do that?

15  A.  -- I did not ask her to read it.

16  Q.  So at that point because it was in Chinese, you made no

17  further effort at that time at Mar-a-Lago to gain access to any

18  type of documentation she may have had as to why she was there?

19  A.  I asked her if we could have consent to look at her

20  electronic devices, in which she verbally gave myself and other

21  agents consent to search her electronic devices.

22  Q.  Was that at the Mar-a-Lago property itself?

23  A.  It was on both Mar-a-Lago property, the adjacent property,

24  and at our office.

25  Q.  OK.  Now, after she gave you the consent, did you ask her

1    to go ahead and use her device to show you any information she

2    had from whatever source that supported her position that she

3    was there for an event that evening?

4    A.  No, I did not.

5    Q.  So not being able to read this document, your position was

6    at that point that you decided to take her to the Secret

7    Service office for further interview?

8    A.  A little bit later on after we moved her to the adjacent

9    property.

10   Q.  OK.  And where was she taken?

11   A.  To the United States Secret Service West Palm Beach

12   resident office.

13   Q.  Now before you took her there, did you make any attempt to

14   have a Mandarin interpreter available at the beginning of

15   whatever interview you were going to have with her at the

16   Secret Service office?

17   A.  No.  We all believed she adequately spoke English to

18   conduct an interview with her.

19   Q.  OK.  But you realize that she is not from this country,

20   right?

21   A.  Yes, I did.

22   Q.  And you realize that she speaks Mandarin, correct?

23   A.  Yes, I do.

24   Q.  And you had a Mandarin interpreter available who could be

25   there from the very inception of your interview with her, is

1    that also correct?

2    A.   Yes.  We could have had him in a response status, but we

3    did not call him immediately.

4    Q.   OK.  So you made that decision, right?

5    A.   Yes, I did.

6    Q.   Now, in light of the fact that there was no Mandarin

7    interpreter, I would assume you knew that your interactions

8    with her as far as your conversations could possibly be of use

9    for evidence at future court proceedings, correct?

10   A.   I do.  I asked her multiple times during our conversation

11   if she understood what I was saying and she responded "English,

12   yes."

13   Q.   So because you knew that it could be used in court

14   proceedings, you did record the interview, correct?

15   A.   The -- while we were at the office?

16   Q.   At the office, did you record the interview?

17   A.   The interview was video recorded.

18   Q.   It is recorded?

19   A.   Video recorded.

20   Q.   There is no audio recording of that interview?

21   A.   No, there's not.

22   Q.   Did you have access to a cell phone at that time?

23   A.   I did.

24   Q.   And did you use the cell phone to ensure that you had not

25   only video but audio of this important interaction?

1   A.   Unbeknownst to me, I did not know our interview room was

2   incapable of audio recording.  My assumption was it was both

3   video and audio recorded.  It was after the fact that I was

4   made aware there was no audio recording.

5   Q.   So how long have you been an agent at that office?

6   A.   Since January of this year.

7   Q.   And before you began this interview, did you make any

8   inquiry as to whether or not there were any video and audio

9   recording devices to ensure that there would be some type of

10  audio recording of this important interaction?

11         MR. GARCIA:  Objection.  Asked and answered.

12         THE COURT:  Right.  I think he answered already that

13  he thought or assumed that there was an audio recording in the

14  room they were in but later learned there was not.

15         THE WITNESS:  Yes, your Honor.

16  BY MR. ADLER:

17  Q.   So why did you assume that there was an audio recording?

18  A.   I was previously, before being assigned to the West Palm

19  Beach resident office, I was assigned to the Miami field

20  office, in which all of our rooms there are also audio and

21  video recorded.  My assumption is that is standard across all

22  Secret Service offices.

23  Q.   All right.  And do you know why the audio was not recorded

24  at the time of this interview with Ms. Zhang?

25         MR. GARCIA:  Objection.  Relevance and asked and

1   answered.

2            THE COURT:  I think it's been asked and answered.

3   BY MR. ADLER:

4   Q.  Well, did you ever inquire as to why it wasn't recorded?

5   A.  I made inquiries with our technical support and they

6   advised me that that room is not supported with audio

7   equipment.

8   Q.  So today obviously you have no audio recordings of this

9   interaction with Ms. Zhang where you claim that she spoke

10  English, is that correct?

11  A.  No, I do not have audio recordings.

12  Q.  Now, in this unrecorded interview with Ms. Zhang, she did

13  mention that she had a friend Charles who had told her to

14  travel from Shanghai to attend an event in Palm Beach where she

15  would be able to attempt to speak with a member of the

16  President's family, is that correct?

17  A.  Yes.  During my interview she stated that Charles informed

18  her to come to Palm Beach to go to Mar-a-Lago for this event

19  and also to attempt to speak with one of President Trump's

20  family members.

21  Q.  And you do have information that, regardless of what

22  Mar-a-Lago had said about the event being promoted, that there

23  had been an event scheduled for that same day in which a member

24  of the President's family was supposed to be in attendance?

25  Correct?

1  A.  My knowledge of that event that was supposed to be

2  scheduled had no relationship to the event that Ms. Zhang had

3  provided.

4  Q.  That wasn't my question.

5  A.  OK.

6  Q.  Whatever that event was and regardless of how you believe

7  it is promoted, originally it was scheduled to have a number of

8  the President's family in attendance, correct?

9          MR. GARCIA:  Objection.  Relevance of any of this.

10          MR. ADLER:  Your Honor, it goes to the nature and

11  circumstances of the offense.

12          THE COURT:  I'll let the witness answer that question.

13  A.  I am not aware of any guests that were to be at that event.

14  Mar-a-Lago did not provide us with any member or guest at that

15  event because it was canceled prior to any of our interactions

16  with President Trump's visit at Mar-a-Lago that weekend.

17  Q.  OK.  So you don't know at this time whether or not that

18  event was supposed to have a member of the President's family

19  in attendance, correct?

20  A.  The only thing I know is the flier that has been pushed out

21  in recent media articles.

22  Q.  All right.  Well, let me ask you about that flier.

23          Let me show you what has been marked as Defense

24  Exhibit No. 6.

25          THE COURT:  Exhibit number what?

```
1              MR. ADLER:  Six.
2    BY MR. ADLER:
3    Q.  Is that the flier that you're referring to?
4    A.  This is the flier that I have seen in recent media
5    articles.
6    Q.  OK.  Now, if you look at the second page of that exhibit,
7    you see that there is a purported translation of that flier.
8              Do you see that?
9    A.  Yes.
10   Q.  OK.  And you say you saw media coverage of this event from
11   which you learned about this flier, correct?
12   A.  Yes.  That is the only time I've seen this flier.
13             MR. ADLER:  Your Honor, at this time we would ask to
14   introduce Defense Exhibit 6.  This is going to be part of the
15   defense proffer that we are going to be making.  It's from
16   the -- one of the articles that had been published relating to
17   the events at Mar-a-Lago, and the translation is from a Miami
18   Herald article about that event, which we also intend to
19   proffer to the court.
20             MR. GARCIA:  Your Honor, we are going to object.
21             THE COURT:  What is the basis?
22             MR. GARCIA:  There is no foundation.  This has to do
23   supposedly with a Miami Herald article.  There is no
24   authentication of the translation.
25             If the defense wants to at some future point bring a
```

1    witness to authenticate this and what it purports to be, then

2    that is a different story.  But at this point he is just trying

3    to offer some newspaper, something that was in the newspaper.

4              MR. ADLER:  May I be heard, your Honor?

5              THE COURT:  I will tell you what I'm going to do.  I'm

6    going to allow it to be admitted.  However, I'm going to

7    determine what weight, if any, to give to it, and I will note

8    the government's objection that there is no authenticating

9    witness for this and it is merely taken from a newspaper

10   article.

11             So I will admit it subject to the government's

12   objection, but I will determine what weight, if any, to give to

13   it.

14             (Defendant's Exhibit 6 received in evidence)

15   BY MR. ADLER:

16   Q.  Do you still have the exhibit in front of you?

17   A.  I do.

18   Q.  Now, Defense Exhibit 6 is a photograph.

19             Do you see that photograph?

20   A.  Yes, I do.

21   Q.  Do you recognize that photograph?

22   A.  Yes, I do.

23   Q.  And who is that?

24   A.  That is President Trump's sister.

25   Q.  And do you see a date at the top of that flier?

```
1    A.  I do.
2    Q.  That date, so it appears to be March 30, 2019, correct?
3    A.  According to the flier, yes.
4    Q.  OK.  And in English is written the name Mar-a-Lago,
5    correct?  It is at the front.
6    A.  Where do you see the translation?
7    Q.  At the top.
8    A.  Yes, that's what's written on the flier.
9    Q.  So getting back to your unrecorded interaction with
10   Ms. Zhang, she did tell you that she was there to attend an
11   event that she believed was scheduled that evening?  Correct?
12   A.  She did say she was there for an event.
13   Q.  Now, your complaint says that you are unable to obtain any
14   information more specifically identifying Ms. Zhang's purported
15   contact with Charles that she referred to, is that correct?
16   A.  Yes, that's correct.
17   Q.  But you did learn from her that her interaction with this
18   Charles had been via WeChat, correct?
19   A.  Yes.
20   Q.  And WeChat is a communication platform sort of like
21   Facebook in China, correct?
22   A.  Yes.
23   Q.  Have you yourself done any type of investigation that
24   involved WeChat?
25   A.  This is my first one with WeChat.
```

1    Q.  But Ms. Zhang, according to your affidavit, she did tell
2    you about her interactions with Charles on WeChat, correct?
3    A.  Yes.  She said that's how they interacted.
4    Q.  OK.  So at this point you had a phone in your possession,
5    right?
6    A.  Yes.
7    Q.  And she had already showed you something on that phone that
8    related to the event that she thought she was attending that
9    evening, correct?
10   A.  Yes, she did.
11   Q.  So at this point, wanting to get more information, you
12   offered her the phone and asked her to access WeChat so that
13   she could show you the interaction she had with Charles,
14   correct?
15   A.  No, we did not.
16   Q.  Did you make any attempt at that time to offer her her
17   phone so that she can provide additional information about her
18   interaction with Charles and WeChat?
19   A.  No, we did not.
20   Q.  Now, the government has referred to some ongoing forensic
21   investigation of the electronics that Ms. Zhang had with her
22   that day.
23        Do you know whether that investigation has gained
24   access to her WeChat account and all of her interactions on
25   that account with whomever?

1    A.  My understanding with the analysis is it's still pending.

2    Q.  OK.  So at this time you have no analysis that you can

3    provide this court that demonstrates one way or the other that

4    with proper access to WeChat there are or are not one or a

5    hundred communications between her and this Charles, correct?

6    A.  Yes.  Until we receive a full analysis back, we do not have

7    any information to provide her story to be true.

8    Q.  Now, in your additional unrecorded communications with

9    Ms. Zhang, she told you that in regard to what occurred at the

10   security gate that when she heard the name Zhang, she just

11   thought it was the person running the event and that she was

12   going to meet them.  That's what she told you, right?

13   A.  That is what she told me.  She was additionally asked if

14   Mr. Zhang was her father, but she responded with, What do you

15   mean by dad?

16   Q.  OK.  But at no point other than her clothes or responses

17   that were not definitive, at no point through this interaction

18   did she ever say that she was either a member of Mar-a-Lago or

19   that she was a member of the Zhang family that was a member at

20   Mar-a-Lago, correct?

21   A.  No, nor did she deny that fact either.

22   Q.  OK.  She clearly had the opportunity to say to you if she

23   had chosen that I am a member of the Zhang family, I have a

24   right to be here.  She could have said that, correct?

25   A.  She could have.

1   Q.   And she didn't, right?

2   A.   She did not.

3   Q.   Now, during the course of the interview, I take it you took

4   notes?

5   A.   My partner did.

6   Q.   And at any time at the conclusion of the interview, and I

7   know you said you thought it was recorded, did you ask your

8   partner to show those notes to Ms. Zhang so that she could read

9   them and if she agreed with them that she could note her

10  agreement on the notes themselves to have proof that she agreed

11  with your summary of the events?

12          Did you do that?

13  A.   No.   I did a verbal review of the interview with Ms. Zhang

14  to make sure my understanding of her story was everything she

15  told me and was true from her point and what she told me, the

16  story, I repeated to her was exactly what she said.

17  Q.   OK.   But we don't know what that story is because it wasn't

18  recorded, right?

19  A.   No --

20  Q.   That was your testimony, right?

21  A.   -- you're correct.

22  Q.   And if they both had been presented to her and then signed

23  by her acknowledging that they were true, then we'd have

24  something from Ms. Zhang agreeing with your conclusions or

25  summary of what you think occurred with regard to that

1    activity?

2            MR. GARCIA:  Your Honor, this is a matter, this

3    commentary --

4            THE COURT:  Sustained.

5            MR. ADLER:  I will withdraw the question, Judge.

6            THE COURT:  No, I will sustain it.  I think that's

7    argument.

8            The question is withdrawn, Mr. Adler?

9            MR. ADLER:  It is, Judge.

10   BY MR. ADLER:

11   Q.  How long was your interaction with Ms. Zhang at Mar-a-Lago?

12   A.  On Mar-a-Lago property or the adjacent property --

13   Q.  Yes.

14   A.  -- approximately an hour and a half.

15   Q.  And how long was your interview with Ms. Zhang at the

16   Secret Service office?

17   A.  Ms. Zhang was at the Secret Service office approximately

18   until 9:30, 10:00 at night.

19   Q.  OK.  But in terms of your interview with her, how long was

20   that interview between you and other agents and Ms. Zhang?  Was

21   it one hour, two hours, three hours, four hours?

22   A.  I would say my interview with Ms. Zhang was approximately

23   four-and-a-half hours.

24   Q.  And at what point in the interview did this agent who

25   speaks Mandarin make an appearance?

1  A.  He made an appearance, I would say, approximately 4:00.  I

2  would have to go back and see when we first contacted him.

3  Q.  But how many hours into your interview with Ms. Zhang did

4  it take for him to make an appearance?

5  A.  I would say approximately two hours.  I would have to go

6  back and review.

7  Q.  And from that point on, from two hours on, there was

8  someone who spoke Mandarin available to interview Ms. Zhang, is

9  that correct?

10 A.  That is correct.

11 Q.  So at the point where you did have someone who speaks her

12 native language available, and it sounds like it is just midway

13 through your interview, you asked this agent because he speaks

14 Mandarin to take over the interview so that he could speak with

15 someone in her native language.  You did that, right?

16           MR. GARCIA:  Your Honor, this is not a --

17           MR. ADLER:  It's just a question, Judge, did he do

18 that.

19           MR. GARCIA:  Compound question.  Can he ask it more

20 direct.

21           THE COURT:  I'll sustain it.

22           Why don't you just ask him a direct question, whether

23 the agent who spoke Mandarin took over the interview.

24 BY MR. ADLER:

25 Q.  You just said that this agent made an appearance

1    approximately two hours into this four-and-a-half-hour

2    interview, is that correct?

3    A.   Yes.

4    Q.   At that point did the agent who was now present who spoke

5    Mandarin, did he take over the interview so that the Secret

6    Service could then communicate directly with Ms. Zhang in

7    Mandarin?

8    A.   No.  Ms. Zhang continued to be interviewed by me in English

9    and any time there was further complication with the language

10   barrier that she needed further understanding, the agent would

11   speak Mandarin to her.  There were times where the Mandarin,

12   they would go back and forth for further explanation and

13   understanding between the two; however, I was still primary

14   interviewer.

15   Q.   So the Mandarin-speaking agent, he was not the one actually

16   speaking to her and conducting the interview.  He was just

17   there to assist if you thought, if there were problem areas in

18   the conversation?

19   A.   He would -- there would be times where their conversation

20   would go and forth.  It's just to make sure Ms. Zhang had

21   a further understanding of what we were trying to discuss.

22   Q.   And do you know whether that agent had with him any type of

23   recording device to record the interview?

24   A.   On him or turned on?

25   Q.   With him, to record the interview.

1   A.  It's possible.  I'm not sure.

2          MR. ADLER:  May I have a moment, Judge?

3          THE COURT:  Yes.

4          (Pause)

5   BY MR. ADLER:

6   Q.  Just one final area of inquiry.

7          Your complaint references that there was some type of

8   malicious malware on the thumb drive that was in Ms. Zhang's

9   possession, correct?

10  A.  Yes, it does.

11  Q.  And you also indicate that there was some preliminary

12  examination of that collected malware, correct?

13  A.  Yes, there was.

14  Q.  By the way, you used the term "malicious malware."  In

15  fact, that is kind of redundant, isn't it?  Malware by its very

16  nature is malicious, correct?

17  A.  Yes, it is.

18  Q.  Now, when you conducted this preliminary examination, did

19  you use a writeblocker?

20  A.  I did not conduct the preliminary examination.

21  Q.  Do you know whether the individual who conducted that

22  preliminary examination used a writeblocker?

23  A.  I am not a hundred percent positive.  That's an area that I

24  have no expertise in.

25  Q.  Well, do you know whether that preliminary examination

1  determined whether the malware was either ransomware or adware

2  or the no access trojans or spyware or worms, any of those

3  particular types of malware?

4          MR. GARCIA:  Your Honor, he's already said he doesn't

5  know.  If he wants to ask him what he knows --

6          MR. ADLER:  That's what I'm asking him, does he know.

7          THE COURT:  All right.  Just do you know if any of

8  that was on there or do you feel comfortable being questioned

9  about that area?

10          THE WITNESS:  I can only relate to what the agent who

11  conducted the preliminary examination stated to me, your Honor.

12          THE COURT:  All right.  And what was that?

13  BY MR. ADLER:

14  Q.  What was that?

15  A.  He stated to me that as he initiated his preliminary

16  examination of the device a file began to immediately install

17  onto his computer.  With his background knowledge and

18  expertise, he stated that this has never happened before when

19  he has done preliminary examinations and he knows that it is

20  very out of the ordinary, especially when conducting an

21  examination in a criminal nature, he stated he had to

22  immediately stop the analysis and shut down his computer for,

23  to halt any further corruption.

24  Q.  OK.  But you didn't know how he did that examination,

25  correct?

1    A.  No, I don't know the technical aspect of it and what he

2    uses.

3    Q.  In regard to the malware, did he give you any information

4    as to identify the specific malware?

5    A.  He stated a file header that was initiated, but I do not

6    know what that is at this time.

7    Q.  He gave you some kind of identifying name and number?

8    A.  I don't recall what he stated.  I just know he stated a

9    file header.

10   Q.  Did you yourself do any type of investigation and analysis

11   of malware?

12   A.  I just conducted a little research of what malware is and

13   its definition.  No technical research into it.

14   Q.  All right.  So at this time you don't know anything about

15   the malware other than what you have related to the court?

16   A.  That is true.  The analysis is still pending, as I stated

17   earlier.

18            MR. ADLER:  Judge, I have no further questions.

19            THE COURT:  All right.  Thank you.

20        So I'll tell you what we're going to do.  We have been

21   going for almost an hour and a half.  I am going to let the

22   interpreter here take a break.  She is probably the hardest one

23   working in the courtroom today.  So we'll take about a five- to

24   ten-minute break and we'll come back and if government counsel

25   has any questions.

```
 1          (Recess)
 2          THE COURT:  The defendant is here, defense counsel is
 3  here, and we have government counsel here.  The agent is still
 4  on the stand, and we have the Mandarin interpreter.
 5          So let's go ahead and proceed.
 6          Mr. Garcia.
 7  REDIRECT EXAMINATION
 8  BY MR. GARCIA:
 9  Q.  Were you able to converse in English in a coherent manner
10  with the defendant?
11  A.  Yes, I was.
12  Q.  And did you attempt to obtain a consent to search her
13  devices from the defendant?
14  A.  Yes, I did.
15  Q.  Tell the court how that whole process occurred.
16  A.  Gave Ms. Zhang our written consent to search computer and
17  electronic equipment form.
18          THE COURT:  Was this at the field office?
19          THE WITNESS:  Yes, it was, your Honor.
20          THE COURT:  All right.  Go ahead.
21          THE WITNESS:  I gave Ms. Zhang time to review this
22  document prior to myself and the special agent who spoke
23  Mandarin reentered the room and asked Ms. Zhang to read the
24  form to us in English, in which she did, multiple paragraphs
25  throughout the entire form.
```

1            During my time going over the form with Ms. Zhang, she

2    would pick out certain words in context throughout the form

3    stating that she did not like that word inside of that sentence

4    on the form.

5    BY MR. GARCIA:

6    Q.  Can you give us an example of that.

7    A.  One example is within the form -- I do not recall the exact

8    wording; however, it says that we can use the information we

9    found from this analysis for any purpose.  Ms. Zhang said that

10   she did not like the word purpose in this sentence.  She said

11   that she wants this changed to have agents specifically write

12   what we are going to be using, all of the information obtained

13   and what specifically it would be used for, not just a general

14   term of purpose.

15   Q.  Was this done in English?

16   A.  This was done in English.

17   Q.  And she was speaking English to you?

18   A.  Yes, she was.

19            MR. GARCIA:  Thank you, sir.

20            THE COURT:  Any further questions?

21            MR. ADLER:  No.

22            THE COURT:  All right, agent.  You can step down.

23            THE WITNESS:  Thank you, your Honor.

24            (Witness excused)

25            THE COURT:  All right.  Any other evidence or

1    testimony that the government wants to put on?

2              MR. GARCIA:  No, your Honor.

3              THE COURT:  Mr. Adler, what about the defense, what

4    would you like to do?

5              MR. ADLER:  Your Honor, at this time, with the court's

6    permission, within the court's discretion, we would like to

7    make a proffer of evidence which we believe that right now we

8    cannot prove through traditional means but we believe with

9    further investigation we will be able to do so, and we believe

10   that the evidence we are presenting does bear sufficient

11   indicia of reliability such that it should be afforded weight,

12   considerable weight by the court.

13             THE COURT:  Well, at a pretrial detention hearing the

14   Rules of Evidence do not apply and the court, the judge,

15   myself, can draw information from any reasonable source and is

16   not limited by the Rules of Evidence.

17             What I will do is I will hear your proffer and, again,

18   I will determine what weight, if any, to give to it in the

19   whole analysis of the entire factual scenario.

20             MR. ADLER:  All right, Judge.  Just as an overview, I

21   think we've heard today that the government has no reason to

22   believe that Ms. Zhang was a spy.  It is the defense position,

23   and we intend to present this as our defense, that she was

24   there --

25             THE COURT:  Hold on just one second.

```
 1              Mr. Garcia, did you want to make a comment?

 2         MR. GARCIA:  Yes, your Honor.  What I meant to say

 3    earlier was that the allegations of the present charges have

 4    no -- there is no allegation that she is a spy, espionage, or

 5    whatever.  There are a lot of questions that remain to be

 6    answered, but at this point we are not alleging in the criminal

 7    filing that she is involved in espionage.

 8         THE COURT:  So if I heard you correct, you're saying

 9    that the criminal complaint and affidavit at this time did not

10    lodge a charge or charges that involve espionage or spying;

11    however, the government continues to investigate whether or not

12    the defendant was engaged in espionage or spying; would that be

13    accurate?

14         MR. GARCIA:  Yes, sir.

15         THE COURT:  All right.

16         MR. ADLER:  Judge, as of now, the government has

17    acknowledged there is no allegation nor has there been direct

18    proof presented that she was there for espionage activities.

19    In fact, beginning with Defendant's Exhibit 1 as part of our

20    proffer, we have provided the court with a receipt in Chinese,

21    and we are getting an official translation of that receipt.

22         THE COURT:  Now, when you say Defendant's Exhibit 1,

23    that was the two passports?

24         MR. ADLER:  Exhibit 2, your Honor.  Excuse me.

25         THE COURT:  Hold on just a second.  We have to keep
```

1   the exhibits straight, Mr. Adler.

2           MR. ADLER:  We do, Judge.

3           THE COURT:  All right.  So Defense Exhibit 2 is a

4   document in a foreign language?

5           MR. ADLER:  Yes, Judge.  We obtained that from sources

6   in China from Ms. Zhang's property, and our unofficial

7   interpretation of that document reflects that it is a wire

8   transfer to the entity by Ms. Zhang named, we believe, Peace

9   Friendship Enterprise Management, LLC.  We will provide an

10  official translation before the next hearing.

11          The amount of the transfer is indicated on the

12  document that we have recovered and we believe that that is

13  something around $20,000 American, more or less.

14          We are proffering that this receipt evidences payment

15  by Ms. Zhang to attend an event that was promoted by her

16  interaction with Charles, who based upon additional information

17  from a proffer, we believe is Charles Lee.

18          THE COURT:  Did this document, Defendant's Exhibit 2,

19  come from the government?

20          MR. ADLER:  It did not, Judge.  It came from our

21  sources in China.

22          THE COURT:  OK.

23          MR. ADLER:  Now, Defendant's Exhibit 3 is a group of

24  translation of a document from Voice of America, a quasi-United

25  States governmental entity, which was published in Mandarin

1    which we have translated using Google Translator.  That is why

2    you can see, for example, the heading refers to -- I don't know

3    if this is the correct pronunciation -- Haihu Manor, but that

4    is Mar-a-Lago.

5         THE COURT:  I'm trying to -- are you talking about

6    Exhibit 3?

7         MR. ADLER:  Exhibit 3, Judge.

8         THE COURT:  It looks like a news article.

9         MR. ADLER:  It is a news article from Voice of

10   America.

11        THE COURT:  All right.  So what relevance, possible

12   relevance would a news article have to this detention hearing?

13        MR. ADLER:  That article contains information about

14   reports in Chinese media that Ms. Zhang's activities here in

15   the United States, if you look on page 2 of the article about

16   more than halfway down, were similar to an organization

17   entitled United Nations Chinese Friendship Association who is

18   reported here having a secretary of Charles Lee, and we have

19   other information as the proffer goes on about Mr. Lee and his

20   organization.

21        On page 3, in the third paragraph that begins

22   "earlier," it goes on to report that, according to the report

23   in Chinese media, in regard to events promoted by Charles Lee,

24   the payee of remittance, according to this article from Voice

25   of America in China, is a Peace Peaceful Enterprise Management

1  Co. Ltd., a private company registered in Beijing.  Based upon

2  the receipt that we have obtained from China, we believe that

3  that is the payee on the receipt reflected in Defendant's

4  Exhibit 2.

5       So in other words, Judge, I believe we are

6  establishing that Ms. Zhang sometime before her attendance at

7  Mar-a-Lago had paid a considerable fee to an entity that is

8  associated with Charles Lee who was promoting or rebundling, is

9  a term that is used, events that were occurring at Mar-a-Lago

10  where individuals from China could meet members of the

11  President's family or other prominent business or political

12  figures in the United States.

13       THE COURT:  What is a considerable fee?

14       MR. ADLER:  Well, here if you look at the wire that

15  Ms. Zhang made to this entity, it is about $20,000 U.S.

16       THE COURT:  20,000 dollars to attend an event at

17  Mar-a-Lago, is that what you are saying?

18       MR. ADLER:  Not just the event, Judge.  If you look at

19  Defense Exhibit 4, which is excellent reporting by the Miami

20  Herald, that article outlines the activities of Cindy Yang and

21  Charles Lee in regard to the promotion of events at Mar-a-Lago.

22       Neither of these individuals actually purchased a

23  rental or were the individuals holding the events.  What

24  Ms. Yang was doing was promoting these events for a fee to

25  individuals to attend along with other things, to meet the

1   President's family or other prominent individuals.  Charles Lee

2   basically is piggybacking on that and he was then promoting the

3   same events to individuals in China where for a fee they could

4   come, pursuant to various types of packages, to the U.S., to,

5   among other things, attend events at Mar-a-Lago.  And that's --

6           THE COURT:  So you're saying that Ms. Zhang wired

7   $20,000 to this entity in order to do what?

8           MR. ADLER:  In order to come to the United States.

9   Among other things, to attend an event that she thought was

10  being held at Mar-a-Lago on the 30th of March.

11          THE COURT:  Do you know what the date of this wire is?

12          MR. ADLER:  Judge, we don't have an official

13  translation, but if you look at the wire itself, you see 2019

14  and you see February, the 19th.  So we believe the wire

15  occurred on February 19, 2019.

16          THE COURT:  All right.  But you don't have an official

17  translation.

18          MR. ADLER:  We do not, Judge.

19          THE COURT:  All right.  Go ahead.

20          MR. ADLER:  Now, there was a mention of Young

21  Adventures or Safari Night by the agent as an event that had

22  occurred at Mar-a-Lago.  If you look at the Miami Herald

23  article, which is Defendant's Exhibit 4, you will see that that

24  was an event or series of events that Cindy Yang was packaging

25  and promoting to Chinese individuals and we believe was being

1   rebundled or repackaged by Charles Lee as part of his

2   promotions.  Again, where you could pay a fee and he would

3   arrange that you would be able to attend such an event.

4        Ms. Zhang has in her interactions with the Secret

5   Service referred to communications that she had with this

6   Charles Lee.  Using photographs that have been available of

7   Charles Lee, we have identified that this is in fact the

8   individual who she was communicating with who is the Charles

9   that is referred to in the affidavit.

10        Mr. Lee, he held himself out to be the founder -- and

11   this is reflected, again, in Defense Exhibit 4 on page 5 -- as

12   the founder of United Nations Chinese Friendship Association.

13   It goes on to talk about his allegations of his affiliation

14   with the United Nations, among other things.

15        We believe that Ms. Zhang's comments to the Secret

16   Service about the name of the organization that she believes

17   was holding the event that she thought she was going to

18   lawfully attend is either -- was very, very similar to the

19   event that we will be able to prove was founded and promoted by

20   this Charles Lee.

21        So in other words, Judge, these exhibits we believe

22   establish and will establish that she came here innocently

23   after paying a fee to, among other things, go to an event that

24   she thought was scheduled at Mar-a-Lago, which we have full

25   access to a reach-out account which show that there are many

1   communications between her and this Charles Lee and, among

2   other things, she was informed that she could go to the event

3   early in order to basically just acquaint herself with the

4   Mar-a-Lago grounds prior to the event.

5        Now, Defendant's Exhibit 5, in conjunction with

6   information that we are obtaining from sources in China -- this

7   is a lot of information we are obtaining about information from

8   various websites, about promotional activity by organizations

9   associated with this Charles Lee.  But we obtained from China

10  photographs that Charles Lee was using to promote his purported

11  ability to put people into events or to associate with

12  prominent individuals here in the United States and, in fact,

13  individuals related to the United Nations.

14       Among those photographs you will see that there's

15  pictures of Charles Lee with a congresswoman, with the

16  secretary -- excuse me, with another congressman.  That is the

17  first photo.  With a famous Chinese leader in New York, where

18  he was pictured with the vice chairman of a prominent National

19  Federation of Industry in China.  There is a picture of him

20  with representatives of the United Nations.  There is a picture

21  of him with Arnold Schwarzenegger, the governor of California,

22  and, according to the picture, famous star who met with Charles

23  Lee.  He represented himself as the secretary general of the

24  United Nations Chinese New York in these photographs, which

25  were disseminated in China.

1              There's pictures of him, Charles Lee, in front of the

2    UN.  There's pictures of him with the general consul to the

3    United Nations of the Chinese government.  That will go on.

4              He also makes allegations that he's pictured with

5    global supermodels.  This seems to be a man who was promoting

6    himself, that if you wanted to contact personally anyone of

7    importance in the United States that he was the go-to guy.

8              THE COURT:  And where is he?

9              MR. ADLER:  We don't know at this point, Judge.  But I

10   believe we very well may attempt to subpoena him to testify at

11   subsequent proceedings.

12             Now Defendant's Exhibit 6, which is already in

13   evidence, we believe that is the event that Charles Lee was

14   rebundling, which was an event that was -- at least there was

15   an event that was scheduled and canceled at Mar-a-Lago on the

16   30th of March, the date that Ms. Zhang arrived at Mar-a-Lago,

17   which we believe was promoted by Ms. Yang and repromoted or

18   rebundled by Charles Lee, and which the President's sister

19   would be in attendance.

20             Lastly, Judge, as part of my proffer I will introduce

21   an article in another magazine that just reflects --

22             THE COURT:  What exhibit is that?

23             MR. ADLER:  This is Defendant's 7, which shows how

24   common the name Zhang is in China.  In essence, it supports our

25   position that in order to gain entry, the only thing that

1  Ms. Zhang did was give a very common Chinese name, with no

2  claims whatsoever that she was there as a member, family

3  member, and it was decided that she be allowed in.  So I don't

4  understand how this could support a trespass charge where she

5  was allowed in after making no type of direct

6  misrepresentation, where apparently it must be either a

7  misunderstanding or failure to follow up of the security staff.

8          That is our proffer at this time, Judge.

9          We hoped to have a blank proposal for the court, but

10  in this somewhat more complicated matter we have to deal with

11  the Immigration detainer.

12          THE COURT:  All right.  So if I understand it

13  correctly, your proffer, you're moving Exhibits 2, 3, 4, 5 and

14  7 to be admitted in support of your proffer, is that correct?

15          MR. ADLER:  Yes.

16          THE COURT:  All right.  The government's position on

17  that is what, Mr. Garcia?

18          MR. GARCIA:  The same objection.  We would object.

19  There is no foundation.

20          THE COURT:  All right.  I am going to admit them as

21  part of the proffer of the defense, especially since the Rules

22  of Evidence don't apply at the pretrial detention hearing.

23  However, I will be determining what weight, if any, to give the

24  documents and the proffer in light of the fact that the

25  government's objection is that there is no authentication or

1    in-person testimony to support the exhibits.

2              (Government's Exhibits 2, 3, 4, 5 and 7 received in

3    evidence)

4         THE COURT:  Now, you had mentioned earlier that you

5    had wanted to continue the balance of the detention hearing

6    until Monday.  Now, is that so you can address other factors

7    relevant to detention and bond and these exhibits you've

8    proffered?

9         MR. ADLER:  Yes.  Primarily it's because we have been

10   in communication with individuals in China and we're hoping to

11   have someone here who can assist with the bond proposal and

12   someone can arrange housing for Ms. Zhang and means of support,

13   and perhaps we can offer some type of collateral for a proposed

14   bond.  We will see if we can get that together by next Monday.

15   We will do our best.

16        THE COURT:  All right.  So in a detention hearing some

17   of the factors that the court considers are the nature and

18   circumstances of the offense or offenses charged, the weight of

19   the evidence, the person's history and characteristics,

20   including character, physical and mental condition, family

21   ties, employment, financial resources, length of residence in

22   the community, community ties, past conduct, criminal history,

23   substance abuse and records concerning appearance at other

24   court proceedings, the nature and seriousness of danger to any

25   person or the community, whether at the time of the offense

1    alleged the person was on probation or parole or on other

2    release pending trial.  And other factors.

3              So I'm trying to understand the additional information

4    and evidence that you're investigating and hope to present.

5              Does that go to the court's determination as to

6    whether or not the defendant should be detained or released on

7    bond or other conditions?

8              MR. ADLER:  That's correct, Judge, if we can come up

9    with some proposal just to show that she has residency and she

10   has sustenance here and can provide some security.  There will

11   be a risk.  We believe that should be something the court

12   should weigh in determining whether she is a risk of flight in

13   consideration with all the other factors.

14             THE COURT:  So you're asking for that to be set for

15   Monday?

16             MR. ADLER:  Yes, your Honor.

17             THE COURT:  Mr. Garcia, the defense is asking to

18   continue the detention hearing.  We have already started it,

19   but to continue it until Monday.  I would be inclined if I was

20   going to grant that to set it for 1 p.m. on Monday.

21             What is the government's position on that?

22             MR. GARCIA:  That is probably best, Judge.

23             THE COURT:  All right.  So I will tell you what,

24   Mr. Adler.  Is there anything else you want to present today?

25             MR. ADLER:  No, your Honor.

```
 1            THE COURT:  All right.  So here's what I'm going to do
 2    then.  First of all, as far as the detention hearing is
 3    concerned, it is still ongoing and I will continue it and
 4    finalize it on Monday, April 15, 2019, and that will be at 1
 5    p.m. here in the West Palm Beach federal courthouse.
 6            I will hear whatever other information the defense
 7    has, and if the government has any rebuttal or other
 8    information, I will hear that as well.
 9            What I will do is continue the court's order that the
10    defendant is held on temporary pretrial detention with no bond
11    in this case until April 15th at 1 p.m. and we can conclude the
12    hearing.
13            What I will do on April 15th is after I hear
14    everything, absent something unusual, then I will issue my
15    decision as to whether she will be permanently detained on
16    pretrial detention throughout the remainder of the case or she
17    will be released on bond or other conditions.
18            So is that acceptable to the defense?
19            MR. ADLER:  Yes, your Honor.
20            THE COURT:  And to the government.
21            MR. GARCIA:  Yes, Judge.
22            THE COURT:  Now, we also have the issue of the
23    defendant's arraignment.  Currently that is set for April 15th
24    at 10 a.m.  It would seem to me to make sense to put that at 1
25    p.m. too rather than requiring separate hearings.
```

```
 1                Any objection from the defense to reset the time only
 2     of her arraignment/preliminary hearing to 1 p.m. on April 15th?
 3                MR. ADLER:  No objection, your Honor.
 4                THE COURT:  All right.  How about from the government,
 5     Mr. Garcia?
 6                MR. GARCIA:  That's fine.
 7                THE COURT:  All right.  So then the preliminary
 8     hearing/arraignment will be set for April 15, 2019 at 1 p.m.
 9     before me.
10                Do you anticipate, Mr. Garcia, that an indictment will
11     be returned by that date?
12                MR. GARCIA:  Yes, sir.
13                THE COURT:  All right.  So, Ms. Zhang, do you
14     understand everything that's happened here today?  You do?
15                THE DEFENDANT:  Yes.
16                THE COURT:  So you are still held on temporary
17     pretrial detention with no bond.  We will be back in court next
18     Monday, April 15th at 1 p.m. and that will be for the
19     continuation of your detention/bond hearing and also for your
20     arraignment or preliminary hearing.
21                Do you understand all that?
22                THE DEFENDANT:  Yes, I understand.
23                THE COURT:  All right.  Anything else from the
24     government?
25                MR. GARCIA:  No, your Honor.
```

1            THE COURT:  Anything else from the defense?

2            MR. ADLER:  No, your Honor.  Thank you.

3            THE COURT:  All right.  The hearing is concluded.

4       We will be back in court on Monday.

5       Thank you.

6            (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


        I hereby certify that the foregoing is an accurate

transcription to the best of my ability of the digital audio

recording in the above-entitled matter.


April 9, 2019            s/ Joanne Mancari
                         Joanne Mancari, RPR, CRR, CSR
                         Court Reporter
                         jemancari@gmail.com